UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

TOMGAL LLC, ET AL.,

                **Plaintiffs,**

    - against -

FRANCESCO CASTANO, ET AL.,

                **Defendants.**

———————————————————————

**22-cv-9516 (JGK)**

<u>MEMORANDUM OPINION</u>
<u>AND ORDER</u>

**JOHN G. KOELTL, District Judge:**

The plaintiffs, TomGal LLC d/b/a Robin Ruth, and RRNY Enterprises LLC d/b/a Robin Ruth (together, "Robin Ruth"), seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) against the defendants, Francesco Castano, and Fashion Code LLC ("Fashion Code"), alleging breaches of contract and fiduciary duty in violation of New York state law, and misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 <u>et seq.</u>, and New York state law. The plaintiffs allege that Castano, a former employee of Robin Ruth, misappropriated Robin Ruth's trade secrets by forming Fashion Code as a direct competitor to Robin Ruth. For the following reasons, the preliminary injunction is **denied.**

**I.**

The following facts constitute the Court's findings of fact and are undisputed unless otherwise noted.

Robin Ruth was founded in The Netherlands in 2002 and "creat[es] fashion forward tourist apparel and accessories in the souvenir industry." Jablonski Decl., ECF No. 6, ¶ 3. Robin Ruth is represented in over eighty countries. Id. Robin Ruth alleges that it has invested "enormous time and resources" into its research and development, resulting in trade secrets including a proprietary business methodology involving "a distribution network that could provide local knowledge and a high level of service," a product testing method that "[u]se[s] wholly owned territories . . . to test products to determine which would sell the best in other markets," and a pricing structure that includes "three levels of pricing," one level of which is "confidential and unique" to each distributor. Id. ¶¶ 8, 13-14. Only five employees at Robin Ruth other than Robin Ruth's principals had access to the pricing structure, and this information was not available on any company accounts or databases accessible to any other individuals. Id. ¶¶ 17-19.

On March 25, 2012, Francesco Castano was hired as the Director of Partnership Development. Id. ¶ 21. Castano's responsibilities included "developing . . . relationships with distributors[] by establishing new relationships, assisting with product development, and providing logistical support to the distributors." Id. By virtue of Castano's position, Castano was one of the five employees who had access to Robin Ruth's pricing

structure and to Robin Ruth's distributor network. Id. ¶¶ 28, 29-33.

On October 21, 2013, Castano entered into a confidentiality agreement with the plaintiffs containing a non-solicitation agreement and a non-compete clause. Id. ¶ 23. The agreement provided that "[a]ll employees must maintain trade secrets and other confidential business information in strict confidence from today and all times in the future," and indicated the following to be examples of trade secrets: "[p]roprietary production processes and sources of supply," "[m]arketing strategies," "[c]ustomer lists that could be used by another business to gain a competitive advantage," and "[r]esearch and development strategies." Id., Ex. A, ECF No. 6-1.[1] The agreement also provided that, for a period of one year after termination of employment, Castano would not "work with any other company which sells or solicits the sale of any product or similar type of [p]roducts sold by [Robin Ruth] during the one year period immediately preceding the termination of this Agreement," or "sell or solicit sales to any customer to whom [Robin Ruth] sold [p]roducts during the one year period immediately prior to the termination of employment." Id.

---

[1] At oral argument, counsel for the plaintiffs appeared to concede that the plaintiffs' customer lists were publicly available and did not constitute trade secrets.

3

In May 2020, Castano created Fashion Code. Jablonski Decl.
¶ 36. Fashion Code was originally created "for the purpose of
selling face masks," and "Robin Ruth worked with Fashion Code to
distribute the face masks" made by Fashion Code. Castano Decl.,
ECF No. 16, ¶¶ 10, 12.

On September 5, 2021, Castano informed the plaintiffs that
he would be resigning from Robin Ruth and "join[ing] his father
in the food distribution business," and on October 1, 2021,
Castano officially stepped down from his role at Robin Ruth.
Jablonski Decl. ¶ 34.[2]

In April 2022, the plaintiffs first became aware that
Castano, through Fashion Code, was selling competing products to
Robin Ruth distributors in Hawaii. Id. ¶ 38. In response, the
plaintiffs asked their distributor in Hawaii to end their
relationship with Fashion Code and Castano. The Hawaii
distributor agreed to do so. At this point, the plaintiffs "did
not deem it necessary to pursue any [legal] action against
Castano" because they "believed this was an isolated incident."
Id. ¶ 39.

_____

[2] The defendants dispute the date on which Castano's
employment with Robin Ruth ended. Castano represents that "by
August 2020, [he] was no longer working as an employee of Robin
Ruth," Castano Decl. ¶ 11, but that on September 5, 2021, he
"emailed representatives of Robin Ruth and asked that the email
be accepted as a 'formal resignation,'" id. ¶ 15. Castano states
that by August 2020, his "individual job duties at Robin Ruth
[had] evaporated." Id. ¶ 11.

In June 2022, the plaintiffs discovered that Castano was also selling competing products to their distributor in Puerto Rico. Id. ¶ 40. In response, the plaintiffs sent an employee to investigate, and discovered that the defendants were using a universal product code ("UPC") registered to Robin Ruth's name to place items in Walmart stores. Id. ¶ 42. The plaintiffs claim that without the use of the plaintiffs' UPC, "Fashion Code would not have been able to place their items in Walmart as easily as they did," id. ¶ 46, and that by doing so, Fashion Code bypassed the consumer safety and quality testing with which all Walmart suppliers are required to comply, id. ¶¶ 67-68. On the other hand, the defendants contend that they never placed the plaintiffs' UPC on their products and that the UPC marker was actually assigned by Walmart. Castano Decl. ¶ 28.

On June 17, 2022, the plaintiffs sent Castano a cease-and-desist letter. Jablonski Decl. ¶ 48. Castano responded to the letter on June 30, denying the allegations. At this point, Robin Ruth "did not pursue any court intervention against Castano or Fashion Code," because "the market in Puerto Rico only represented 2% of [Robin Ruth]'s total revenue, and Robin Ruth did not believe that this issue would reach the continental United States markets." Id. ¶ 50.

In October 2022, a Robin Ruth employee discovered Fashion Code products in New York. Id. ¶ 51. There is no allegation as

to the quantity of the defendants' products that have been sold in New York, and by October 2022, the non-compete provision in Castano's contract would have expired. There is also no evidence that the placement of Fashion Code products in New York resulted from the defendants' alleged use of the plaintiffs' trade secrets, and there are no details of the relationship between the plaintiffs and the defendants with respect to the placement of Fashion Code products in New York stores.

After discovering Fashion Code products in New York, the plaintiffs conducted an investigation into Castano's actions. Id. ¶ 52. The investigation revealed that "Castano had been soliciting sales from [Robin Ruth's] distributor in Hawaii in June of 2021," that "Castano had been shipping duplicate, competing products to a Robin Ruth distributor in Puerto Rico as early as September of 2021," and that "Castano had attempted to solicit sales from [Robin Ruth's] distributor in Atlanta on September 7, 2021." Id. ¶¶ 53-54, 60. During those time periods, Castano was allegedly still formally employed by Robin Ruth.

The plaintiffs bring claims for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets, alleging that Castano violated the non-competition and non-solicitation clauses in his confidentiality agreement, in addition to misappropriating Robin Ruth's trade secrets for the benefit of Fashion Code. The plaintiffs seek a preliminary

6

injunction enjoining the defendants from using or disclosing Robin Ruth's trade secrets and from "violating, or participating in the violation of" Castano's confidentiality agreement for a period of one additional year. Compl., ECF No. 1, at 13-14.

## II.

The following constitutes the Court's conclusions of law.

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007), and it "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).[3] "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018). A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009).

---

[3] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

### III.

#### A.

The plaintiffs have not shown that they will suffer irreparable harm in the absence of a preliminary injunction. Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley, 559 F.3d at 118. To show irreparable harm, the plaintiffs "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Id. "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Id.

In this case, an award of money damages would adequately remedy the injury that the plaintiffs allege they have suffered. The plaintiffs allege that the defendants have misappropriated their trade secrets in direct competition with the plaintiffs, resulting in quantifiable lost sales – that is, every unit of inventory that Fashion Code sells to a Robin Ruth distributor is a sale that Robin Ruth did not make. See id. at 119 ("[T]he only possible injury that the plaintiff may suffer is loss of sales to a competing product . . . which should be fully compensable by money damages."). Consequently, any injury suffered by Robin Ruth is entirely monetary, quantifiable, and redressable by

appropriate damages. See Art & Cook, Inc. v. Haber, 416 F. Supp. 3d 191, 198 n.5 (E.D.N.Y. 2017) (finding that plaintiff failed to demonstrate irreparable harm where the plaintiff "has not alleged that [the defendant] has or will disseminate the information to any of [the plaintiff's] competitors, as doing so would impair its value for [the defendant] in connection with his own venture").

The plaintiffs argue that there is a rebuttable presumption of irreparable harm given an alleged misappropriation of trade secrets. "[T]he loss of trade secrets cannot be measured in money damages," where that secret is "lost forever." Id. at 118.[4] However, Robin Ruth's trade secrets here have not been lost forever. The plaintiffs have not alleged that their trade

---

[4] The presumption of irreparable harm in copyright and trademark infringement cases has been abandoned in the Second Circuit. See Salinger v. Colting, 607 F.3d 68, 74-75 (2d Cir. 2010); U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 539-540 (S.D.N.Y. 2011) (collecting cases). It is unclear whether the presumption has been abandoned in the context of a claim for misappropriation of trade secrets, because Faiveley was decided before Salinger. However, in light of Faiveley, other well-reasoned decisions have clarified that "to automatically presume irreparable harm upon [a] determination arising from a trade secret misappropriation is not correct," and "[a]bsent a showing that [an] alleged misappropriation of trade secrets cannot be remedied by an award of monetary damages," irreparable harm should not be inferred. TGG Ultimate Holdings, Inc. v. Hollett, No. 16-cv-6289, 2016 WL 8794465, at *4 (S.D.N.Y. Aug. 29, 2016). Moreover, the Salinger Court saw no reason why the abandonment of the presumption of irreparable harm "would not apply with equal force to an injunction in any type of case." Salinger, 607 F.3d at 78 n.7.

secrets have been disseminated by the defendants to "a wider audience," such that they no longer remain secret and are lost forever. Id. ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets."). Indeed, because the defendants have allegedly been using the plaintiffs' trade secrets for their own profit, the defendants likely "have the same incentive as the [plaintiffs] to maintain the confidentiality of the secret in order to profit from the proprietary knowledge." Id. at 119. Consequently, there is little danger that the plaintiffs' trade secrets, whatever they may be, will be disseminated widely in such a way as to destroy their secrecy and cause the plaintiffs irreparable harm.

Instead, the plaintiffs allege only that the defendants have used the plaintiffs' trade secrets for the defendants' own pecuniary gain. When "a misappropriator seeks only to use [trade] secrets — without further dissemination or irreparable impairment of value — in pursuit of profit, no such presumption [of irreparable harm] is warranted because an award of damages will often provide a complete remedy for such an injury." Id. at 118-19. The plaintiffs are therefore not entitled to a rebuttable presumption of irreparable harm.

The plaintiffs' deficient showing of irreparable harm is further supported by their significant delay in filing the current action. A significant delay in moving for a preliminary injunction "may, standing alone, . . . preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995). Although "[t]here is no bright-line rule for how much delay is too much, . . . courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P., No. 21-cv-38, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021).

The plaintiffs allegedly first learned of the defendants' actions in April 2022, when they discovered that the defendants were selling competing products to Robin Ruth distributors in Hawaii. The plaintiffs did not bring legal action at this point, but instead asked the Hawaii distributor to end its relationship with the defendants, which the Hawaii distributors agreed to do. In June 2022, the plaintiffs then learned that the defendants were selling competing products to their Puerto Rico distributor. The plaintiffs again did not bring legal action at this point, and instead conducted an investigation that

11

culminated in the plaintiffs sending a cease-and-desist letter
to the defendants, to which the defendants responded denying the
allegations against them. Finally, in October 2022, the
defendants' products were found in New York stores, prompting
another investigation which "revealed that Castano had been
misappropriating [Robin Ruth's] trade secrets and acting in
direct competition since at least the beginning of 2021." Compl.
¶ 38.

The plaintiffs filed the current action on November 7,
2022. The earliest knowledge they had of the defendants' actions
was from April 2022. Seven months elapsed between that time and
the request for a preliminary injunction, a significant delay
which suggests that there is no "urgent need for speedy action
to protect the plaintiffs' rights." Hodnett, 2021 WL 535485, at
*6 (declining to grant a preliminary injunction given a nine-
month delay, and citing cases where delays of six, five, and
four months were too long).

Although a delay is excusable "if the movant can provide a
credible explanation for its inactivity," for example, if the
parties had pursued "settlement negotiations" or if "the harm
largely is prospective and will arise from a discrete future
event," neither scenario obtains here. Id. By the end of June
2022, the plaintiffs had unsuccessfully requested that the
defendants cease and desist their actions. The defendants had

therefore demonstrated their unwillingness to negotiate by
refusing the plaintiffs' request and denying the underlying
allegations. And, also by June 2022, two discrete events of
alleged misappropriation and competition had occurred,
foreclosing any notion that the alleged harm to the plaintiffs
by that point was purely prospective. Indeed, the plaintiffs had
sent Castano a cease and desist letter in June 2022. Even as
measured from June 2022, a five-month delay elapsed before the
filing of the current action – still too long to support a
finding of irreparable harm. See Grout Shield Distribs., LLC v.
Elio E. Salvo, Inc., 824 F. Supp. 2d 389, 403 (E.D.N.Y. 2011)
(finding that a five-month delay undercut the plaintiff's
showing of irreparable harm).

Furthermore, although "the loss of client relationships and
customer goodwill that results from the breach of a non-compete
clause generally constitutes irreparable harm," Marsh USA Inc.
v. Karasaki, No. 08-cv-4195, 2008 WL 4778239, at *14 (S.D.N.Y.
Oct. 31, 2008), the plaintiffs have not claimed that they have
actually lost clients or experienced diminished goodwill as a
result of the defendants' actions. The plaintiffs only claim
prospectively that such a loss could occur. However, the
plaintiffs must allege "an injury that is neither remote nor
speculative, but actual and imminent" to support a showing of
irreparable harm. Faiveley, 559 F.3d at 118. Here, the

plaintiffs have not done so. The plaintiffs' claims otherwise
are merely speculative as to the possibility of future harm.

The plaintiffs argue that, after April 2022, "[Robin Ruth]
. . . thought this was an isolated incident . . . [and] did not
think it an efficient use of its resources to litigate at the
time," Pls.' Reply, ECF No. 17, at 2, and that after June 2022,
"[Robin Ruth] did not believe this issue would reach the
continental United States markets . . . [and] did not pursue any
court intervention against [the] [d]efendants," id. at 3. But
this argument only supports further the notion that a
preliminary injunction was not needed urgently, and in turn
undermines any belief that the plaintiffs have suffered, and
will continue to suffer, irreparable harm. The plaintiffs
concededly did not believe that litigation would be "an
efficient use of [their] resources," Pls.' Reply at 2, upon
first learning of the defendants' alleged misbehavior. This
belief, in turn, significantly weakens any perception that the
plaintiffs had suffered an irreparable harm sufficient to
support a preliminary injunction.

**B.**

The balance of equities also favors the defendants in this
case and weighs against issuing a preliminary injunction. In
determining whether the balance of the equities tips in the
plaintiff's favor and whether granting a preliminary injunction

14

would be in the public interest, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id.

First, the restrictive covenants expired, at the latest, on October 1, 2022. Accordingly, Castano and Fashion Code have been free to compete with the plaintiffs after that date. Issuing an after-the-fact preliminary injunction would at this point serve no purpose other than to punish the defendants for their alleged misbehavior.

Second, "Fashion Code is a very small operation," with only two employees. Castano Decl. ¶ 3. The plaintiffs seek to enjoin Fashion Code from competing with Robin Ruth for an additional year.[5] Enjoining the defendants in this way would potentially put Fashion Code out of business.

---

[5] The plaintiffs suggest in supplemental briefing that the Court can extend the one-year non-competition and non-solicitation period imposed by the confidentiality agreement for an additional year. ECF No. 23. The plaintiff cites to Marsh USA Inc. v. Karasaki, No. 08-cv-4195, 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) for this proposition. But Marsh is inapposite because, in that case, the motion for a preliminary injunction was made promptly during the applicable period of the restrictive covenant, whereas here the plaintiffs have moved for a preliminary injunction after the restrictive covenant had

Finally, the plaintiffs have not shown that they will be irreparably harmed by the defendants' actions because they may still seek damages for the defendants' alleged misbehavior. A damages remedy would fully and adequately redress the plaintiffs' alleged injury. This is not a case where there is a demonstrated loss of an established client relationship such that it would be "very difficult to calculate monetary damages that would successfully redress the loss of [that] relationship" because that relationship could "produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999). The plaintiffs have not claimed that any of the Hawaii, Puerto Rico, or Atlanta distributors have ended their relationships with Robin Ruth as a result of the defendants' actions.[6] Nor have the plaintiffs alleged that Walmart has ended its relationship with Robin Ruth as a result

---

expired. Moreover, the injunction in Marsh was supported by three months of expedited discovery and an evidentiary hearing, neither of which are present here.

In any event, the argument is unpersuasive because any such extension would still require a showing of irreparable harm, which the plaintiffs have failed to show here. The defendants are free to compete with the plaintiffs after the expiration of the restrictive covenants and any allegations that the defendant holds a competitive advantage over the plaintiffs, obtained through alleged violations of the non-competition provision, is purely speculative.

[6] In fact, with respect to the Hawaii distributor, the plaintiff has alleged the opposite: the plaintiffs' distributor in Hawaii agreed to end its relationship with the defendants after the plaintiffs discovered that the defendants were dealing with that distributor.

of the defendants' actions. At most, the plaintiffs articulate
only a speculative, unsubstantiated fear that such a possibility
may occur. Accordingly, the balance of equities weighs in favor
of the defendants, and against a preliminary injunction.

Nor does the public interest favor the plaintiffs. The
plaintiff argues that there is a public interest in enforcing
contracts, including any restrictive covenants contained in
those contracts. However, as of October 1, 2022, there is no
restrictive covenant to enforce, with one limited exception:
there remains an agreement, which is not time bound, restricting
Castano from using Robin Ruth's trade secrets. However, this
exception does not tip the balance in favor of the plaintiffs
because the plaintiffs may still pursue ordinary judicial
relief, such as a damages remedy, for any alleged
misappropriation of trade secrets by Castano, and because there
is little danger that the plaintiffs' alleged trade secrets will
be widely disseminated. Thus, any interest the public may have
in enforcing contracts is not undermined by denying the
plaintiffs' application for a preliminary injunction.

The plaintiffs also argue that granting a preliminary
injunction is in the public interest because doing so would
"encourage[] future investment in innovation." Pls.' Memo., ECF
No. 7, at 30. However, it is not clear here what public-facing
innovation the plaintiffs have pursued. The plaintiffs allege

only that their proprietary business model has been misappropriated by the defendants. Granting a preliminary injunction against the defendants' continued use of this proprietary business model would neither encourage nor discourage future investment in public innovation.

Moreover, the public interest would be disserved by a preliminary injunction. The public would be deprived of the goods provided by Fashion Code as well as the competition that Fashion Code generates for Robin Ruth – competition that would benefit the public and which, at this point, the defendants are not restricted from pursuing. Accordingly, the plaintiffs' motion for a preliminary injunction is **denied**.[7]

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The plaintiffs' motion for a

---

[7] Because the Court finds that the plaintiffs have failed to show irreparable harm necessary to support a preliminary injunction, and because the balance of equities and the public interest in this case do not weigh in favor of the plaintiffs, it is unnecessary at this point to reach a determination as to the plaintiffs' likelihood of success on the merits of their underlying claims. It would also be particularly inappropriate to reach the merits in this case because of the sparsity of the evidentiary record at this point. In any event, any such merits determination would not affect the ultimate disposition of the plaintiffs' request for a preliminary injunction.

preliminary injunction is **denied**. The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:    New York, New York
          December 19, 2022

                                  John G. Koeltl
                        United States District Judge